**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| DAWN A. HAWKINS,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 3:22-CV-02284<br><br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**MEMORANDUM OPINION AND ORDER** |

Plaintiff ("Plaintiff" or "Ms. Hawkins") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 7.)  For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

## I. Procedural History

Ms. Hawkins protectively filed applications for DIB and SSI on November 4, 2020.[1]  (Tr. 16.)  She alleged a disability onset date of February 28, 2020, due to: arthritis in the neck, back, and hip; degenerative disc disease with bulging disc in neck and back; carpal tunnel; lump in right breast that was being monitored; swelling in left leg (lymphadenopathy); and abnormal and

---

[1] Ms. Hawkins filed prior applications for DIB and SSI, alleging a disability onset date of February 2, 2018 (Tr. 16, 72), but an administrative law judge issued an unfavorable decision on February 27, 2020 (Tr. 16, 69-84).

lengthy menstrual cycle.  (Tr. 16, 21, 90, 103, 127, 139, 251.)  Her application was denied at the initial level (Tr. 16, 123-32) and upon reconsideration (Tr. 16, 135-42).  Following her request for hearing (Tr. 16, 143-44), a telephonic hearing was conducted before an Administrative Law Judge ("ALJ") on October 14, 2021 (Tr. 16, 34-68).

The ALJ issued an unfavorable decision on January 12, 2022, finding Ms. Hawkins had not been under a disability from February 28, 2020, through the date of the decision.  (Tr. 13-33.) The Appeals Council denied Ms. Hawkins's request for review on October 28, 2022, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  Ms. Hawkins then filed this pending appeal (ECF Doc. 1), which is fully briefed (ECF Docs. 9, 11, 13).

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Hawkins was born in 1977 and was 43 years old on the alleged disability onset date. (Tr. 26.)  She has at least a high school education.  (*Id.*)  She lived with her husband and two minor daughters.  (Tr. 50.)  Ms. Hawkins last worked for short periods in 2018 and 2019 as a cleaner for a building cleaning service and as a cash room assistant at a casino, but she left both jobs because her back was hurting.  (Tr.  52-53.)

### B.    Medical Evidence

#### 1.    Relevant Treatment History

##### i.    Treatment History Prior to Alleged Onset Date

Ms. Hawkins underwent a cervical MRI on March 12, 2019, which showed minimal multilevel degenerative disc disease without canal stenosis or foraminal narrowing.  (Tr. 439-42.)  In November of 2019, she attended a pain management office visit with Elaine Swope, APRN-CNP, at the Mercy St. Charles Pain Clinic.  (Tr. 487-97.)  She reported 60-70% improvement after a cervical epidural steroid injection in April 2019, but said her neck and back

pain had increased and she had numbness in her arms.  (Tr. 487.)  She demonstrated cervical and lumbar tenderness on examination, with normal strength but a sensory deficit; her BMI was 39.94.  (Tr. 495.) She was scheduled for another cervical epidural injection.  (Tr. 496-97.)

She attended an office visit with spine specialist David Beeks, M.D., at Mercy Health on January 7, 2020. (Tr. 389-91.)  She reported that her neck pain had improved with cervical injections.  (Tr. 389.)  However, she noticed a burning sensation in her lower back with feelings of spasms when she attempted to return to work.  (*Id.*)  Her physical examination findings were unremarkable, with a normal range of motion in her neck, normal gait, normal strength, and no sensory deficits.  (*Id*.)  Lumbar spine x-rays taken that day showed age-appropriate spondylosis with no acute fractures, dislocations, or severe disc space collapse.  (Tr. 391, 428.)  Dr. Beeks diagnosed spinal stenosis in the cervical region and recommended physical therapy.  (Tr. 391.)

Ms. Hawkins attended two physical therapy sessions in January 2020 (Tr. 383-88), but could not tolerate the therapy because it caused an increase in her neck pain and headaches (Tr. 384).  She returned to Dr. Beeks on February 11, 2020.  (Tr. 380-82.)  Examination findings remained unremarkable.  (Tr. 382.)  Dr. Beeks recommended an MRI of the lumbar spine.  (*Id*.)

### ii.    Treatment History After Alleged Onset Date

Ms. Hawkins returned to Dr. Beeks for follow up on May 19, 2020.  (Tr. 377-79.)  She reported that her pain had slowly gotten worse.  (Tr. 378.)  Insurance approval had not yet been obtained for the MRI.  (*Id*.)  On examination, Ms. Hawkins's range of motion and gait were normal and she did not demonstrate sensory deficits.  (Tr. 379.)  Dr. Beeks noted that diagnostic x-rays revealed developing 3 mm spondylolisthesis at L4-5.  (*Id.*)  He again recommended a lumbar MRI.  (*Id.*)  Ms. Hawkins's lumbar spine MRI was performed on July 8, 2020.  (Tr. 340-41, 419-22.)  It showed a disc bulge at L4-5 with moderate bilateral facet arthrosis and mild right

3

foraminal narrowing, but no spinal canal narrowing.  (*Id*.)  It also showed a disc bulge at L5-S1 with mild bilateral foraminal narrowing and no spinal canal narrowing.  (*Id*.)

On August 14, 2020, Ms. Hawkins participated in a telehealth pain management appointment with Kiran Tamirisa, M.D., at Mercy Health.  (Tr. 371-77, *see also* Tr. 497-506.) Her chief complaint was pain in the cervical and low back regions.  (Tr. 371-72.)  She reported that the cervical pain she was experiencing was similar to cervical pain she had in the past.  (Tr. 372.)  She had tried physical therapy and injections in the past.  (*Id*.)  She said physical therapy made her pain worse, but injections had helped with her cervical pain.  (*Id*.)  She reported that her neck pain was constant and rated her pain a five out of ten, but said it varied in intensity between a two and ten.  (*Id.*)  Her neck pain was aggravated by position, stress, twisting, and bending.  (*Id*.)  Symptoms associated with her neck pain included headaches and numbness in both hands.  (*Id*.)  She reported that her low back pain started six to eight months earlier and described the pain as constant, aching, and burning.  (*Id*.)  She rated her back pain an eight out of ten, with the pain ranging between a four and ten; it was aggravated by bending, standing, sitting, lying down, lifting, and coughing.  (*Id*.)  She reported that her current medications were helping with her pain and she was able to do her activities of daily living due to her medications.  (*Id*.) She was diagnosed with lumbar radiculopathy, cervical radicular pain, lumbar back pain, arthropathy of the lumbar facet joint, and lumbosacral spondylosis without myelopathy.  (Tr. 376.)  Dr. Tamirisa recommended that Ms. Hawkins proceed with a lumbar epidural steroid injection at the L4-L5 level (*id.*), which she received on September 14, 2020 (Tr. 369-71). During a telephone call with Kelly Chany, RN the day after her injection, Ms. Hawkins reported she was "doing well" but did not "feel 100% better yet."  (Tr. 369.)

4

During a November 9, 2020 telephonic pain management appointment with Dr. Tamirisa, Ms. Hawkins reported that the September lumbar injection did not help her pain.  (Tr. 359.)  In addition to back pain, she complained of worsening neck pain with severe headaches and pain radiating into her upper extremities.  (*Id*.)  She also reported numbness in her right arm and difficulty exercising.  (*Id*.)  Since cervical injections had provided relief in the past, she expressed interest in having another cervical injection.  (*Id*.)  There was no physical examination.  (Tr. 361-62.)  Dr. Tamirisa noted that Ms. Hawkins "exhibited signs of radiculopathy with positive cervical traction test on bilaterally."  (Tr. 364.)  She diagnosed cervical radicular pain, lumbar radiculopathy, lumbar back pain, arthropathy of lumbar facet joint, and lumbosacral spondylosis without myelopathy.  (Tr. 363.)  Ms. Hawkins was scheduled for a cervical steroid injection at C5 and C6, and instructed to return two weeks after the procedures.  (Tr. 364.)

On January 19, 2021, Ms. Hawkins had a telephonic pain management appointment with Kimberly Vriezelaar, APRN-CNP, at Mercy Health regarding her neck pain.  (Tr. 525-29.)  She reported significant relief after her April 2019 cervical epidural injection and requested a repeat injection.  (Tr. 525.)  She rated the severity of her neck pain a six out of ten and reported that her symptoms were aggravated by activity; she described the pain as aching with stiffness and headaches, and said bed rest, use of a neck support, and NSAIDs provided minimal relief.  (*Id*.)  There were no physical examination findings.  (Tr. 527-28.)  Pre-procedural instructions were reviewed with Ms. Hawkins.  (Tr. 528.)

On January 25, 2021, Ms. Hawkins attended an in-person pain management appointment with Dr. Tamirisa.  (Tr. 529-36.)  On examination, Dr. Tamirisa noted muscular tenderness in Ms. Hawkins's neck, but no neck rigidity.  (Tr. 532.)  There was no edema in the legs.  (*Id*.)  Ms. Hawkins's motor function was intact with no weakness, but her triceps and biceps reflexes were

reduced.  (Tr. 532-33.)  Range of motion testing in Ms. Hawkins's back was "[p]ainful and somewhat limited."  (Tr. 533.)  Dr. Tamirisa commented that Ms. Hawkins exhibited "signs of radiculopathy with positive cervical traction test on bilaterally."  (Tr. 536, *see also* Tr. 533.)  Ms. Hawkins was diagnosed with cervical radicular pain and cervical degenerative disc disease (Tr. 536), and received a cervical epidural steroid injection (Tr. 537-39).

On February 9, 2021, Ms. Hawkins had a telephonic pain management appointment with CNP Vriezelaar.  (Tr. 539-42.)  She reported that her cervical injection provided 40% relief from her neck pain headaches, and that the "relief [was] getting better each day."  (Tr. 539.)  She rated her neck pain as three out of ten, and said her symptoms were aggravated by "twisting and position."  (*Id*.)  CNP Vriezelaar instructed Ms. Hawkins to follow up as needed.  (Tr. 542.)

During a gynecological appointment at Center for Health Services on March 3, 2021 (Tr. 551-58), Ms. Hawkins had normal neck and musculoskeletal range of motion (Tr. 555).

On July 12, 2021, Ms. Hawkins attended a telephonic pain management appointment with CNP Vriezelaar.  (Tr. 605-08.)  She reported that her neck pain was "gradually returning" and requested a repeat cervical injection.  (Tr. 605.)  She reported increased muscle spasms in her back and neck with prolonged walking, described her neck pain as aching with cramping and stiffness, and rated the severity as six out of ten.  (*Id*.)  She reported that her pain was aggravated by "position and twisting" and that she continued to have headaches.  (*Id*.)  She denied new neurological symptoms, weakness, or falls.  (*Id*.)  She indicated conservative treatment, including bed rest, neck support, cervical epidural injections, and icy hot, had provided mild relief.  (*Id*.)  She was diagnosed with cervical radiculopathy.  (Tr. 608.)  CNP Vriezelaar noted that Ms. Hawkins's pain in her neck and arms continued despite conservative measures, and prescribed Zanaflex and a repeat cervical epidural injection.  (*Id*.)

Ms. Hawkins had a cervical epidural injection on July 19, 2021.  (Tr. 610.)  She attended a telephonic appointment with CNP Vriezelaar on August 2, 2021, where she reported no relief from the recent injection, but said she wanted to wait and see if there was improvement over the upcoming week because it had taken two to three weeks after past injections to have relief.  (Tr. 610, 613.)  She rated the severity of her neck pain a six out of ten.  (Tr. 610.)  She continued to complain of headaches and numbness and tingling.  (Tr. 610, 612.)  She denied weakness, problems with coordination, or falls.  (*Id*.)  CNP Vriezelaar instructed Ms. Hawkins to follow up if she did not have improvement and noted that they might consider updated imaging.  (Tr. 613.)

On August 30, 2021, Ms. Hawkins presented to Bhavani Koneru, M.D., an internal medicine provider at ProMedica Physicians Adult Medicine.  (Tr. 631.)  She requested a refill of her gabapentin, noting she ran out four to five months earlier.  (*Id*.)  Her BMI was 45.48 with a weight of 273 pounds. (Tr. 633.)  Her physical examination findings were generally unremarkable, but trace pretibial edema was noted in the left lower extremity.  (*Id*.)  Dr. Koneru recommended that Ms. Hawkins follow a low salt diet, check her blood pressure at home, and continue taking Maxide.  (Tr. 634.)  Gabapentin was prescribed for lumbar and cervical radiculopathy and cervical degenerative disc disease. (*Id*.)  Dr. Koneru recommended that Ms. Hawkins wear support hose, elevate her legs when possible, and quit smoking.  (*Id*.)

On September 9, 2021, Ms. Hawkins attended a diabetes medication management appointment with pharmacist Brittany Holzhauer, RPH, at ProMedica Physicians Adult Medicine.  (Tr. 626-29.)  She reported she was compliant with her medications, but was not yet following a diabetic diet, did not have a meter to check her blood sugars at home, and was unable to exercise.  (*Id*.)  Bloodwork from August 30, 2021, indicated that her A1c had increased to 8.3, from 5.9 in 2018.  (Tr. 627.)  She was diagnosed with uncontrolled type 2 diabetes and her

7

Metformin was increased.  (Tr. 628-29.)  RPH Holzhauer encouraged Ms. Hawkins to test her blood sugar twice a day, increase her aerobic exercise, and follow a diabetic diet.  (Tr. 629.)

### 2.    Opinion Evidence

#### i.    State Agency Reviewing Consultants

On February 5, 2021, state agency medical consultant Dana Schultz, M.D. opined that Ms. Hawkins had the physical RFC to perform light exertional level work with: no climbing of ladders, ropes, or scaffolds; frequent climbing of ramps and stairs; frequent stooping, kneeling, crouching, and crawling; occasional use of the bilateral lower extremities for operation of foot controls; occasional use of her bilateral upper extremities for overhead reaching; frequent use her bilateral upper extremities for other reaching, handling, and fingering; and avoidance of all exposure to hazards, such as dangerous moving machinery and unprotected heights.[2]  (Tr. 93.)

Upon reconsideration, state agency medical consultant Leon Hughes, M.D. affirmed Dr. Schutlz's opinion.  (Tr. 112.)

#### ii.    Psychological Consultative Examination

On December 2, 2021, Ms. Hawkins presented to Melissa Lanza, Ph.D., for a psychological consultative evaluation as part of her disability application process.  (Tr. 639-48.) She reported that she was applying for disability due to neck and back issues, hip replacement, pain, and swelling of her left leg.  (Tr. 640.)  She denied a history of mental health treatment or current mental health symptoms.  (Tr. 641.)  She reported the following physical medical conditions: degenerative disc disease, arthritis at base of neck, bulging discs in neck and back, right hip replacement, and type 2 diabetes.  (Tr. 640.)

---

[2] The RFC assessment was an adoption of RFC from the ALJ decision dated February 27, 2020.  (Tr. 93.)

As far as activities of daily living, Ms. Hawkins reported that she was able to get up, shower, and dress on her own, but said that she used a cane at times for mobility.  (Tr. 641.)  She could shop for groceries but needed assistance carrying the grocery bags, so her husband or adult daughter went with her.  (*Id*.)  She could prepare meals, but she could not stand too long at the stove or the sink.  (*Id*.)  She could only drive short distances because her hands "tend[ed] to fall asleep."  (*Id*.)  She said her eleven-year-old daughter was a big help to her at home with doing chores.  (*Id*.)  She spent time performing seated exercises and she enjoyed reading, watching Netflix and spending time with her family.  (*Id*.)

Dr. Lanza conducted a mental status examination.  (Tr. 641-43.)  She concluded that Ms. Hawkins did not meet the diagnostic criteria for any DSM-V mental health disorders that would limit her work-related functional abilities.[3]  (Tr. 643-44.)

## C.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the telephonic hearing on October 14, 2021, Ms. Hawkins testified in response to questioning by the ALJ and her representative.  (Tr. 37-59.)  She testified she was disabled and had been unable to work since February 2020 because she could not concentrate due to neck pain and daily headaches that varied in severity from day to day.  (Tr. 37-38.)  She said her inability to work was also due to: pain and numbness in her arms that caused her to drop things and make mistakes at work; her hands going so numb at times that she did not know how much pressure she was placing on things; and swelling in her leg which caused discomfort in her shoes and caused her to trip because she could not feel her foot touching the ground.  (Tr. 38.)

---

[3] As to Ms. Hawkins's ability to maintain attention and concentration and maintain persistence and pace to perform simple and multi-step tasks, Dr. Lanza noted that Ms. Hawkins "described limitations with task completion primarily due to her medical symptoms, relying on family members to assist with physical tasks."  (Tr. 644.)

Ms. Hawkins said that the pain in her arms was mild but was always present, and that it got worse as she did more.  (Tr. 54-55.)  She said she had numbness in both arms every day; the numbness came and went, and traveled throughout her arms into her fingertips.  (Tr. 55.)  She described the numbness as tingling, burning, aching, and radiating.  (*Id*.)  She said the pain and numbness in her arms limited her ability to perform normal daily activities like she had in the past, including doing her daughter's hair, taking care of her home, and cooking.  (Tr. 56.)  It was also difficult for her to button a shirt or tie shoes, and she could not move as quickly as she had in the past because she messed things up and broke things.  (*Id*.)  She also could not write for a long period of time, she cut her finger once while making dinner, and she could not pick up heavy pots.  (*Id*.)  She said she could use her hands for something like counting money for about 20-30 minutes, but then would have to stop for about 10-15 minutes before she would start to get the feeling back in her hands.  (Tr. 57.)

Ms. Hawkins first saw her orthopedic specialist Dr. Beeks in May of 2020.  (Tr. 43, 57-58.)  At that time, Dr. Beeks diagnosed her spondylolisthesis at L4 and L5.  (Tr. 58.)  There was an area in her lower back that would start to burn if she stood or walked for too long.  (*Id*.)  She said it would feel like someone was "holding a flame" to her back and that the pain would "start to wrap around [her] waist," like she was "wearing a . . . belt of fire."  (*Id*.)  She also said it would feel like someone was "just crushing" her lower back and "trying to push it down" and then her hip would "start to ache," and her "leg [would] go numb."  (*Id*.)  She also had back spasms if she moved around a lot or lifted heavy things.  (Tr. 58-59.)  When she had a back spasm, she could not move for two to ten minutes.  (Tr. 59.)  Doing a lot of bending or picking up anything would bring on a back spasm.  (Tr. 46, 59.)  She could pick up everyday items like

pillows, but would have problems if she tried to pick up a small cooler; she did not pick up her grandchild, who weighed about twenty pounds, for fear of having a back spasm. (*Id*.)

Ms. Hawkins sometimes used a cane that her doctor had prescribed for her. (Tr. 49.) It helped her to use the cane, especially when she was going up stairs. (*Id*.) Using the cane while going up stairs was like having a rail on both sides; she felt more secure because it felt like something was "pressing" on her spine, "like [her] spine [was] being crushed every time [she] step[ped] up." (*Id*.) She also used her cane if she took a walk in the park with her children because her leg would sometimes feel numb or her hip would feel like it was going to give out. (Tr. 50.) She took breaks when she went on walks at the park; she noted that there were benches every quarter mile or less at the park where she walked. (*Id*.)

Ms. Hawkins was referred to physical therapy twice for her neck pain and headaches. (Tr. 38-39.) The last time she attended physical therapy was in the fall of 2020. (Tr. 39-40.) Physical therapy was stopped that time after two sessions because the physical therapist did not think Ms. Hawkins could continue; she had bulging discs in her neck and lower back, and the therapy aggravated her neck and lower back issues. (*Id*.) When she stopped physical therapy, she was given seated home exercises that were basically stretching exercises geared towards improving her range of motion. (Tr. 39.)

Ms. Hawkins wore a soft neck brace if her neck was really hurting her, which occurred three or four times each month. (Tr. 48.) One issue with wearing the brace was that her neck seemed to hurt more after she took it off. (Tr. 49.) The pain in her neck was aggravated by performing household chores and "constant turning." (*Id*.)

Ms. Hawkins had cervical and lumbar epidural injections starting in September of 2020. (Tr. 40-41.) The cervical injections helped with her headaches for a month to a month-and-a-

11

half, but she usually had to wait at least four months between injections.  (Tr. 41-42, 45.)  The lumbar injections did not help.  (Tr. 41.)  She was prescribed a muscle relaxer to help with her lumbar spine issues, but she took only it when she had a back spasm because it made her tired.  (Tr. 45-46.)  She also took ibuprofen for her neck, back, and leg pain.  (Tr. 48.)  Dr. Beeks recommended "shaving" Ms. Hawkins's elbows to relieve some of the tension in her arms, but Ms. Hawkins was not comfortable with that procedure.  (Tr. 42, 44.)  Dr. Beeks did not recommend surgery as an alternative.  (Tr. 45.)

Ms. Hawkins said that the swelling in her left leg worsened when she walked more.  (Tr. 46-47.)  The leg swelling started about two years prior to the hearing.  (Tr. 47.)  She was told that the swelling in her left leg could be related to her three prior hip surgeries, one of which was a hip replacement about eight years prior to the hearing.  (Tr. 46-47.)  She was prescribed medication to help with water retention and her blood pressure.  (Tr. 47-48.)

Ms. Hawkins also testified that she was recently diagnosed with type 2 diabetes.  (Tr. 51.)  She had started medication for her diabetes and reported no diabetes symptoms other than feeling tired a lot.  (*Id*.)  She also had a mass in her right breast that her doctors were monitoring; they did not feel it was something to worry about.  (*Id*.)

Ms. Hawkins said her neck pain and the numbness in her arms limited her ability to drive more than two miles.  (Tr. 42, 53-54.)  She did not drive often and said the last time she drove was two to three weeks before the hearing.  (Tr. 54.)  She usually had her adult daughter drive her to her doctor appointments or used a driving service provided through her insurance company.  (*Id*.)

12

2.      **Vocational Expert's Testimony**

A Vocational Expert ("VE") testified at the hearing.  (Tr. 59-67.)  The ALJ observed that there was no past relevant work to consider.  (Tr. 59.)  The VE testified that a hypothetical individual of Plaintiff's age and education and with the functional limitations described in the ALJ's RFC determination could perform the following light exertional positions: merchandise marker, sorter, and housekeeping cleaner.  (Tr. 60-62.)  The VE testified that the identified light exertional positions, like all light work, would not be available if the individual required use of a cane less than one-third of the workday for walking, standing, and balance.  (Tr. 62-63.)

If an individual was limited to occasional handling and fingering bilaterally, rather than frequent handling and fingering bilaterally, the VE testified that the identified light jobs and all of the light occupational base would be eliminated.  (Tr. 66.)  The VE also testified that a limitation to occasional handling and fingering would eliminate sedentary occupations.  (Tr. 67.)

The VE testified as to employers' expectations regarding standard breaks, staying on task, and absenteeism.  (Tr. 63-64.)  Specifically, the VE explained that standard breaks usually included two fifteen-minute breaks and a thirty-minute lunch during an eight hour workday, and that an individual could be subject to reprimand or dismissal if an unscheduled break interrupted the workflow or work process.  (Tr. 64.)  The VE further explained that an individual would be subject to reprimand and/or dismissal if she was consistently off task 10% of the workday.  (*Id.*)  Therefore, the VE testified that requiring a rest period of six minutes or longer, with no use of hands, after a period of performing fine or gross activities with the arms and hands for thirty minutes, would be work preclusive.  (Tr. 67.)  The VE also explained that missing one day or more per month outside of allowed sick or vacation time, or being absent more than ten days over the course of the year, would likely be work preclusive.  (Tr. 64-65.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520, § 416.920[4]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy.  *Id.*

## IV.     The ALJ's Decision

In her January 12, 2022 decision, the ALJ made the following findings:[5]

1.     The claimant meets the insured status requirements of the Social Security
       Act through September 30, 2020.  (Tr. 19.)

2.     The claimant has not engaged in substantial gainful activity since February
       28, 2020, the alleged onset date.  (*Id.*)

3.     The claimant has the following severe impairments: lumbar radiculopathy,
       cervical radiculopathy, cervical spinal stenosis, lumbar spondylosis,
       obesity, a history of carpal tunnel syndrome and ulnar neuropathy.  (*Id.*)
       The claimant has the following non-severe impairments: diabetes,
       hypertension, hyperlipidemia, and vitamin D deficiency.  (Tr. 20.)  The
       claimant's migraines or headaches were not found to be medically
       determinable or severe.  (Tr. 19-20.)

4.     The claimant does not have an impairment or combination of impairments
       that meets or medically equals the severity of the listed impairments in 20
       C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 20.)

5.     The claimant has the residual functional capacity to perform light work as
       defined in 20 CFR 404.1567(6) and 416.967(b) except frequent overhead
       reaching; frequent handling and fingering; no climbing ladders, ropes and
       scaffolds or crawling and occasional bending, kneeling and crouching; can
       occasionally climb ramps and stairs and can work in environments with no

---

[4] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[5] The ALJ's findings are summarized.

assembly line production dictated by an external source; can occasionally use foot controls; and should avoid dangerous machinery and unprotected elevations.  (Tr. 20-26.)

6.      The claimant is unable to perform any past relevant work.  (Tr. 26.)

7.      The claimant was born in 1977 and was 43 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  (*Id*.)

8.      The claimant has at least a high school education.  (*Id*.)

9.      Transferability of job skills is not material to the determination of disability.  (*Id*.)

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including merchandise marker, sorters, and housekeeping cleaner.  (Tr. 26-27.)

Based on the foregoing, the ALJ determined that Ms. Hawkins had not been under a disability, as defined in the Social Security Act, from February 28, 2020, through the date of the decision.  (Tr. 27.)

## V.      Plaintiff's Arguments

In her sole assignment of error, Ms. Hawkins argues that the ALJ committed reversible error when she made Step Three findings as to Listings 1.15, 1.16, 1.18, and 11.14 that contained no discussion of the relevant evidence, no comparison to the requirements of the listings, and no explanation of the basis for the ALJ's ultimate conclusions.

## VI.     Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ

16

applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## B.     Sole Assignment of Error: Whether ALJ's Step Three Analysis as to Listings 1.15, 1.16, 1.18, and 11.14 Amounted to Reversible Error

Ms. Hawkins's sole assignment of error pertains to the ALJ's finding at Step Three. (ECF Doc. 9, pp. 2, 12-16.)  She argues the ALJ erred in her analysis of Listings 1.15, 1.16, 1.18, and 11.14, because she did not discuss the relevant evidence, compare that evidence to the requirements of the listings, and explain her conclusions regarding those listings.  (*Id*. at pp. 12-13.)  The ALJ made the following findings with respect to the identified listings:

> **4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 16.926).**
>
> The claimant's impairments have been evaluated in the context of the Listings, including but not limited to Listing 1.15, 1.16, 1.18 and 11.14 to determine whether the claimant's impairment, singularly or in combination, meet or medically equal one of the listed impairments.

(Tr. 20 (bold in original).)  The Commissioner responds that remand is not warranted because Plaintiff has not shown a "substantial question" as to whether she met or equaled the criteria for any of the relevant listings (ECF Doc. 11, pp. 8-11), and because substantial evidence supported the ALJ's finding that Ms. Hawkins did not meet or equal a listing (*id*. at pp. 11-13).

At Step Three of the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the listings in the Listing of Impairments.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).  "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing.'"  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th

Cir. 2011) (quoting 20 C.F.R. § 404.1525(c)(3)).  The claimant bears the burden to prove that her

condition meets or equals a listing.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d); *Peterson v.*

*Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014) (citing *Foster v. Halter*, 279 F.3d

348, 354 (6th Cir. 2001)).  To do so, a claimant "must present specific medical findings that

satisfy the various tests listed in the description of the applicable impairment or present medical

evidence which describes how the impairment has such equivalency."  *Thacker v. Soc. Sec.*

*Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004).

　　　"[N]either the listings nor the Sixth Circuit require the ALJ to 'address every listing' or

'to discuss listings that the applicant clearly does not meet.'" *Smith-Johnson v. Comm'r of Soc.*

*Sec.,* 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of Soc. Sec.*, 544 F.

App'x 639, 641 (6th Cir. 2013)).  An "ALJ should discuss the relevant listing, however, where

the record raises 'a substantial question as to whether [the claimant] could qualify as disabled'

under a listing."  *Smith-Johnson*, 579 F. App'x at 432 (citing *Abbott v. Sullivan*, 905 F.2d 918,

925 (6th Cir. 1990)) (alteration in original).  To demonstrate a "substantial question," the Sixth

Circuit has explained that "[a] claimant must do more than point to evidence on which the ALJ

could have based his finding."  *Id.* (citing *Sheeks*, 544 F. App'x at 641–42); *see also Sheeks*, 544

F. App'x at 642 (explaining that establishing a "substantial question" requires more than "a mere

toehold in the record on an essential element of the listing").  "Rather, the claimant must point to

specific evidence that demonstrates [s]he reasonably could meet or equal *every requirement* of

the listing."  *Id.* (emphasis added).  "Absent such evidence," an ALJ "does not commit reversible

error by failing to evaluate a listing at Step Three."  *Id.* at 433.

　　　Where the record demonstrates a "substantial question" as to whether a claimant meets or

equals a listing, the Sixth Circuit has held that the ALJ must "evaluate the evidence, compare it

to . . . the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review."  *Neace v. Comm'r of Soc. Sec.*, No. 22-5090, 2022 WL 20742559, at *3 (6th Cir. Sept. 14, 2022) (quoting *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011)). Such explanation is needed to demonstrate that the ALJ's findings were supported by substantial evidence.  *Id.*  But an ALJ need "not spell[] out every consideration that went into the step three determination," *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006), and the substantial evidence standard may be met where "the ALJ made sufficient factual findings elsewhere in [her] decision to support [her] conclusion[s] at step three," *Forrest v. Comm'r of Soc.* Sec., 591 F. App'x 359, 366 (6th Cir. 2014) (citations omitted).

Here, the ALJ explained that she evaluated Ms. Hawkins' impairments in the context of the listings and found Ms. Hawkins did not have an impairment or combination of impairments that met or medically equaled the severity of any listed impairment.  (Tr. 20.)  In so finding, she specified that she had considered the following listings: Listing 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root); Listing 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina), Listing 1.18 (abnormality of a major joint in any extremity), and Listing 11.14 (peripheral neuropathy).  (*Id.*)  She did not provide further analysis or explanation of her reasons for finding Ms. Hawkins did not meet or equal the identified listings.

The first three listings relate to musculoskeletal disorders.  *See* 20 C.F.R. Part 404, Subpt. P, App. 1, §§ 1.00, *et al.*  To meet any of the three, Ms. Hawkins must show that the medical records document specified symptoms (paragraph A), signs on physical examination (paragraph B), findings on imaging and/or examination (paragraph C), *and* impairment-related limitations supported by specific medical documentation (paragraph D).  *See* 20 C.F.R. Part 404, Subpt. P, App. 1, §§ 1.15, 1.16, 1.18.  For example, for the paragraph C requirements to be met, the record

must contain imaging showing compromise of a nerve root in the cervical or lumbosacral spine (§ 1.15C), compromise of the cauda equina with lumbar spinal stenosis (§ 1.16C), or an anatomical abnormality of a major joint, as specified (§ 1.18C).  For the requirements of paragraph D to be met, the record must contain medical documentation showing: (1) a medical need for a walker, bilateral canes, or bilateral crutches, or a wheeled and seated mobility device involving the use of both hands; or (2) an inability to use *one* upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements, *and* a medical need for a one-handed, hand-held assistive device that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand; or (for Listings 1.15 and 1.18) (3) an inability to use *both* upper extremities in that neither can be used to independently initiate, sustain, and complete work-related activities involving fine and gross movements.  *See* 20 C.F.R. Part 404, Subpt. P, App. 1, §§ 1.15D, 1.16D, 1.18D.  Satisfying the D criteria based on a need for an assistive device requires a "documented medical need" for the device, meaning "there is evidence from a medical source that supports [a] medical need for an assistive device . . ." *Id*.

The final listing in question is a neurological disorder.  *See* 20 C.F.R. Part 404, Subpt. P, App. 1, §§ 11.00, *et al.*  There are two ways to satisfy Listing 11.14, peripheral neuropathy.  *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.14.  To satisfy listing 11.14A, a claimant must demonstrate disorganization of motor function in two extremities resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing and walking, or use the upper extremities.  *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.14A.  An "extreme limitation" means an inability to stand and remain upright while standing or walking without the assistance of another person, a walker, two crutches, or two canes, or an inability to use both

21

upper extremities to perform fine and gross movements such as pinching, handling, lifting, or carrying.  *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.00D(2).  To satisfy listing 11.14B, a claimant must demonstrate a marked limitation in physical functioning *and* a marked limitation in at least one area of mental functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.  *See* 20 C.F.R. Part 404, Subpt. P, App. 1, § 11.14B.

Without addressing the specific requirements of any of the four identified Listings, Ms. Hawkins argues that remand is required under Sixth Circuit caselaw because "the ALJ must discuss the relevant listings, compare those Listings to the Plaintiff's proffered medical evidence, and must give a reasoned conclusion that explains why the Plaintiff does not meet or medically equal the relevant listings."  (ECF Doc. 9, p. 15; *see id.* at pp. 13-15 (citing *Reynolds*, 424 F. App'x 411 and *Harvey v. Comm'r of Soc. Sec.*, No. 16-3266, 2017 WL 4216585, at *1 (6th Cir. Mar. 6, 2017)).)  She does not argue that the record demonstrates a "substantial question" as to whether she "reasonably could meet or equal every requirement" of any of the four listings, *Smith-Johnson*, 579 F. App'x at 432, until her reply brief, where she generally argues:

> In the present case, Plaintiff has clearly presented specific medical evidence to raise a substantial question of whether she met or medically equaled the requirements of multiple Listings. Plaintiff has presented evidence of her medical encounters where she exhibited pain, reduced ranges of motion, decreased reflexes, and tests showing cervical radiculopathy. Plaintiff has presented relevant testimony from her hearing describing how her impairments affected her life.  Plaintiff has presented evidence of electrodiagonstic testing, MRIs of the spine, and surgical records speaking directly to the relevant severe impairments.

(ECF Doc. 13, pp. 4-5 (citing to ECF Doc. 9, pp. 4-11).)  In presenting this argument, she does not directly address any of the specific requirements of the listings identified in her appeal.  In particular, she does not explain how the imagery she describes compares to the paragraph C requirements in Listings 1.15, 1.16, or 1.18, does not point to medical source evidence

documenting the medical need for assistive devices as contemplated in paragraph D and Listing 11.14A, and does not identify evidence supporting marked limitations in physical *and* mental functioning as contemplated in Listing 11.14B.[6]

Although each of the relevant listings contain specific requirements, as discussed above, there are some common elements.  For example, evidence that Ms. Hawkins relied on a walker, two crutches, two canes, or the assistance of another person to stand, maintain balance, and/or walk over a 12-month period or longer could meet the D criteria for the three musculoskeletal listings or Listing 11.14A.  The same would be true of an extreme limitation in both upper extremities—like an inability to handle, finger, reach, lift, or carry—or a similar inability to use one upper extremity along with a documented medical need for the use of a cane.

Here, even though the ALJ did not discuss her reasoning for finding Ms. Hawkins did not meet or equal a listing at Step Three, she did discuss the following in her Step Four analysis:

- Ms. Hawkins' reported ability to take walks, prepare meals, do laundry, and wash dishes, limited by back pain and a 2013 hip replacement surgery (Tr. 21-22);

- Her reported use of a cane prescribed by Dr. Buck, specifically on the stairs and when taking her children walking (*id.*);

- Her reported difficulty using her hands due to carpal tunnel syndrome, including difficulty holding her phone, washing dishes, and doing her daughter's hair (Tr. 22);

- Imagery showing minimal degenerative disc disease of the cervical spine and spondylosis of the lumbar spine at L4-5 (*id.*);

- Physical examination findings showing normal gait and strength, full range of motion, and no sensory deficits (Tr. 22-23);

- Imagery showing disc bulges at L4-5 and L5-S1 with mild foraminal narrowing and moderate bilateral facet arthrosis but no spinal canal narrowing (Tr. 23);

---

[6] Indeed, she would be hard pressed to show a "marked" mental limitation where the only medical opinion of record addressing her mental functioning found she did not "meet diagnostic criteria for any DSM-5 mental health disorders" and found no work-related mental limitations.  (Tr. 643-44.)

- Imagery showing mild osteophyte complex with uncovertebral hypertrophy at C5-6 and C6-7 without canal stenosis or foraminal narrowing (*id.*);

- Physical examination findings showing diminished reflexes in the upper extremities, cervical tenderness, and somewhat limited range of motion (*id.*);

- Her reported failure to refill her Gabapentin for four to five months (Tr. 24); and

- Her reported ability to: get up, shower, and dress on her own; shop for groceries if someone helped carry the bags; prepare meals without standing too long at the stove or sink; and drive short distances before her hands fell asleep (*id.*).

The ALJ also discussed and adopted the opinions of the state agency medical consultants that

Ms. Hawkins had the physical ability to perform light exertional work with occasional use of

foot controls and frequent reaching, handling, and fingering with both arms.  (Tr. 24-25.)  But

she modified the overhead reaching restriction from occasional to frequent, explaining:

> The undersigned finds that the current record lacks sufficient evidence to support the prior restriction to occasional use of the bilateral upper extremities for overhead reaching.  The objective imaging notes only mild degenerative changes in the cervical spine, she has not required surgical intervention and has otherwise received conservative treatment with anti-inflammatories, muscle relaxers, physical therapy and occasional injections [].  Additionally, she reported that she is able to prepare meals, shop for groceries and perform some household chores [].

(Tr. 25 (citations omitted).)  After considering all of the evidence described in her decision, the

ALJ explained that she found Ms. Hawkins' subjective complaints regarding her functional

limitations "somewhat inconsistent" with the medical evidence of record because:

> [T]he record as a whole does not demonstrate the existence of limitations of such severity as to have precluded onset date of disability. While imaging studies showed some positive findings, the claimant retains generally normal strength and normal gait [].  The claimant reports that she occasionally uses a cane; however, the use of a cane is not mentioned during the numerous office[] visits contained in the record. She reported that she is able to prepare meals, go for walks, perform household chores, drive and shop for groceries [].  Additionally, it does not go unnoticed that, in spite of the claimant's report of numbness, tingling and pain, she went four to five months without refilling her Gabapentin [].  This suggests that the claimant's symptoms were manageable and did not rise to the level of disability.

(*Id.* (citations omitted).)

24

Returning to applicable Sixth Circuit caselaw, the Court finds first that Ms. Hawkins has failed to show a "substantial question" as to whether she could meet or equal Listings 1.15, 1.16, 1.18, or 11.14 by "point[ing] to specific evidence that demonstrates [s]he reasonably could meet or equal *every requirement* of" any of those listings.  *See Smith-Johnson*, 579 F. App'x at 432 (emphasis added).  Her references to imagery without specifying how that imagery is equivalent to the paragraph C requirements, and her discussion of limitations in the use of her extremities without explaining how they equate to the very significant limitations described in paragraph D or Listing 11.14, amount to no more than a "mere toehold in the record on an essential element of the listing," which is insufficient to raise a "substantial question" under *Sheeks*, 544 F. App'x at 642.  Because Ms. Hawkins did not raise a substantial question as to whether she could meet or equal every element of any of the relevant listings, the ALJ's cursory evaluation of those listings at Step Three was not reversible error.  *See Smith-Johnson*, 579 F. App'x at 433.

Further, after considering the ALJ's discussion of the subjective complaints, medical evidence, treatment records, medical evidence, and her RFC findings at Step Four of the sequential analysis, as outlined above, the Court also finds the ALJ "made sufficient factual findings elsewhere in h[er] decision to support h[er] conclusion at step three" that Ms. Hawkins did *not* meet or equal Listings 1.15, 1.16, 1.18, or 11.14.  *See Forrest*, 591 F. App'x at 366. Particularly given Ms. Hawkins' failure to demonstrate a "substantial question" as to whether the specific listings were met or equaled, the Court finds Ms. Hawkins also has not met her burden to show that the ALJ's Step Three findings lacked the support of substantial evidence in the context of the ALJ decision as a whole.

For all of the reasons set forth above, the Court finds that Ms. Hawkins has not met her burden to demonstrate that the ALJ's findings at Step Three amounted to reversible error. Accordingly, the Court finds her sole assignment of error lacks merit.

### VII.   Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's final decision.

August 6, 2024

*/s/Amanda M. Knapp*
AMANDA M. KNAPP
United States Magistrate Judge